IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
September 18, 2002 Session

## STATE OF TENNESSEE v. SAMMIE DON LOGUE

**Direct Appeal from the Circuit Court for Maury County**
**No. 11349     Stella L. Hargrove, Judge**

_____

**No. M2001-02497-CCA-R3-CD - Filed April 28, 2003**

_____

The Maury County Grand Jury indicted the Defendant for selling less than 0.5 grams of cocaine, and following a trial, a Maury County jury convicted the Defendant of the casual exchange of a controlled substance. The trial court sentenced him to eleven months, twenty-nine days' incarceration and suspended all but forty-five days of the sentence. On appeal, the Defendant argues that the trial court erred by refusing to allow him to introduce evidence concerning the source of the cocaine and by denying him full probation. We find no error by the trial court and therefore affirm the Defendant's conviction and sentence.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which THOMAS T. WOODALL and JAMES CURWOOD WITT, JR., JJ., joined.

John S. Colley, III, Columbia, Tennessee, for the appellant, Sammie Don Logue.

Paul G. Summers, Attorney General and Reporter; Helena Walton Yarbrough, Assistant Attorney General; T. Michael Bottoms, District Attorney General; Lawrence R. Nickell, Jr., and Daniel J. Runde, Assistant District Attorney Generals, for the appellee, State of Tennessee.

**OPINION**

The following evidence was presented at the Defendant's trial: Ken York, city manager for the City of Spring Hill, testified that records from his office indicated that the Defendant was employed as a police patrol officer for the Spring Hill Police Department from 1995 until he resigned in 1999. York stated that as a police officer, the Defendant was required to attend forty hours of training each year.

James David Shannon, an investigator for the Maury County Drug Task Force, testified that he was involved in the investigation of this case. He reported that a confidential informant was used in this case and explained that a confidential informant is someone who has "past criminal charges

that they might need to work off." He also explained that confidential informants who cooperate with police are not prosecuted for their own crimes. Shannon testified that the confidential informant in this case was Jennifer Arango. He stated that while he was working undercover, Arango twice sold him quantities of marijuana, first six grams and later one ounce. He reported that after her arrest, Arango agreed to cooperate with the police in exchange for their agreement not to prosecute her for the sales. Shannon also agreed to pay Arango for successful transactions, and he stated that he believed he paid her between $50 and $100 for the transaction involving the Defendant.

In her capacity as a confidential informant, Arango first assisted the authorities in making two arrests in cases involving marijuana. Following these two arrests, Arango telephoned Shannon and told him that the Defendant also sold marijuana. Shannon stated that he was familiar with the Defendant as a police officer in Spring Hill, and he also knew that the Defendant was applying for a position as a police officer for the City of Columbia. He recalled that he was therefore extremely surprised to hear Arango mention the Defendant's name. Shannon stated that at the time Arango named the Defendant as a potential suspect, the Defendant was working as a security guard at a McDonald's restaurant.

At approximately 10:00 p.m. on September 24, 1999, Arango was outfitted with a body wire and sent to meet the Defendant at the McDonald's where he worked. She was expected to purchase one ounce of marijuana from the Defendant for $100. Shannon testified that prior to her leaving, officers searched Arango's car and purse, and the officers were satisfied that Arango was not in possession of marijuana at the time she left to meet the Defendant. Two officers were already stationed at the McDonald's waiting for Arango to arrive. When Arango arrived, she met and spoke with the Defendant, but he did not sell her marijuana at that time. An audiotape was made of the meeting. Following Arango's meeting with the Defendant, Shannon and Arango met at Shannon's office, and he told Arango to inform him of any further contact she had with the Defendant.

On September 29, 1999, at approximately 4:20 p.m., Arango telephoned Shannon, and Shannon instructed her to return to his office. There, officers again searched her purse and the vehicle that she was driving, which was a leased car. On this occasion, a wire was placed inside Arango's vehicle. Arango planned to meet the Defendant at a Shoney's parking lot and buy a quantity of cocaine for $50. Four undercover officers, in two separate vehicles, were present at the scene: Shannon and another officer listened to and recorded the transaction on audiotape in one vehicle. Two other officers were also present in a second vehicle to videotape the transaction. Shannon testified that the Defendant arrived at the scene at approximately 5:00 p.m., and the transaction took place. After the transaction, the officers followed Arango back to the Drug Task Force office, and Arango gave them a plastic baggie containing cocaine. The officers searched Arango and did not find the $50 that they had given her to complete the transaction.

Shannon testified that he later presented the case to the Maury County Grand Jury for its consideration. He explained that he did not arrest the Defendant at the time of the transaction because if he had done so, he would not have been able to use Arango as a confidential informant

again. Shannon reported that the Defendant was arrested on November 30, 1999, after the Maury County Grand Jury returned an indictment against him. Shannon stated that after his arrest, the Defendant was read his Miranda rights and was interviewed. The interview was videotaped and audiotaped.

Shannon testified that during the interview, the Defendant never claimed to have had a romantic relationship or sexual intercourse with Arango. He also testified that the Defendant did not tell officers during his interview that Arango had threatened to accuse him of rape unless he procured drugs for her. According to Shannon, the Defendant in no way claimed that he had been compelled to make a drug sale. Shannon further testified that he did not believe that the Defendant told officers that his arrest was a result of a conspiracy involving other officers on the police force. According to Shannon, the Defendant instead told officers that he had been drinking, that he did not remember the transaction, and that he did not even know the girl who met him in the Shoney's parking lot. Shannon stated, however, that the Defendant later admitted that he knew Arango as a person who passed through the McDonald's parking lot.

Shannon Allen testified that she worked for the City of Columbia Drug Task Force. She stated that her general duties included filing paperwork, typing, answering phones, and general accounting. She reported that she had transcribed the audiotapes in this case.

The transcriptions of the recorded conversations between Arango and the Defendant on September 24 and 29, 1999 were introduced as an exhibit at trial. During the conversation on September 24, 1999, the Defendant is quoted as saying: "Now I'm gonna trust you now, don't you goddamn sell me out. I'll f__king kill you. I'll kill you. I'll never sell to you again. Well I'm not selling to you[;] I'm just kinda the middle man." During the conversation on September 29, 1999, the Defendant, presumably commenting about the cocaine, is quoted as follows: "It's good [']cause, I had some that he sold my sister not to[o] long ago." During this conversation, he also told Arango that the source of the cocaine is "closely connected with [him] and someone in [his] family." He offered to "hook [Arango] up with" the source and stated, "I'll talk to him and see if I can't hook you up with like a [. . .] bigger wad . . . ." The Defendant further informed Arango to "put [the cocaine] on a . . . joint" to "get a good buzz going."

Donna Flowers, a forensic chemist employed by the Tennessee Bureau of Investigations (T.B.I.) Crime Laboratory in Nashville, testified that she had been employed by the T.B.I. for twelve years. She stated that she analyzed the substance which was transferred from the Defendant to Arango in this case. She reported that the substance was cocaine, a Schedule II controlled substance, and she stated that it weighed 0.4 grams.

William Dole, an employee of the Maury County Sheriff's Department, testified that he was assigned to the Drug Task Force. He reported that he made a videotape of the transaction in this case that took place in the Shoney's parking lot. He stated that at the time, Agent Tommy Goetz was with him. Dole testified that after the transaction, he copied the videotape that he had recorded on his Sony 8mm video recorder onto a VHS tape so that it would be easier to view. He stated that he had

been unable to locate the original 8mm tape on the night prior to trial; however, he maintained that the VHS tape was a true and accurate copy of the original tape and that it depicted what he had witnessed. The tape was then admitted into evidence.

Jennifer Arango testified that she was twenty-one years old at the time of trial and that she was twenty years old in September 1999. She stated that she was divorced and had a three-year-old daughter. She testified that in September 1999, she was working in a cafeteria at the Saturn plant. Arango testified that she was twice caught selling marijuana to Officer Shannon in 1999. She stated that Shannon offered to drop all charges against her if she agreed to work for him. She stated that she was paid $50 for her work in the Defendant's case. She also reported that she was not being paid to testify in court.

Arango testified that she met the Defendant when he worked as a security guard at McDonald's. She stated that she and her friends often drove through the parking lot, and she testified that she often spoke with the Defendant while she was there. She maintained that she never dated the Defendant or engaged in sexual relations with him. She also maintained that she never visited the Defendant's house and that he never visited hers. When asked whether the subject of drugs arose during her conversations with the Defendant, Arango replied, " [W]e talked about just smoking [marijuana] and he had mentioned that him [sic] and a friend used to go out to Nashville and hangout and smoke and drink."

Arango recalled that she mentioned the Defendant's name to Officer Shannon in late August or early September 1999 after he asked her whether she knew of anyone else who sold drugs or had offered them to her. She stated that she was aware at the time that the Defendant had previously been a police officer. She also stated that she believed the Defendant was a drug user, rather than a drug dealer. Arango testified that Shannon instructed her to contact the Defendant, and a couple of nights later, she drove through the McDonald's parking lot and spoke with the Defendant, trying to obtain marijuana. According to Arango, the Defendant told her "he'd work on it." Arango testified that she asked the Defendant how she could contact him, and he gave her his pager number.

Arango stated that she and the Defendant later arranged to meet on September 24, 1999 at McDonald's so that she could buy an ounce of marijuana. She recalled that she first contacted Officer Shannon and then went to the Drug Task Force office, where her car was searched and where she was wired. She stated that she was provided with $100 to make her purchase. Arango then drove to McDonald's, followed by undercover officers, and met the Defendant, who got into her car. Arango testified that the Defendant told her that the man who was to have supplied her with marijuana had been to McDonald's and had already left. A tape of this meeting was played for the jury.

A tape of the transaction that led to the Defendant's arrest was next played for the jury. Afterwards, Arango commented on the tape. She testified that on September 29, 1999, she met the Defendant in a Shoney's parking lot, where he gave her a bag of cocaine in exchange for $50. She stated that as the Defendant handed her the bag, he told her, "It's good because I had some that he

sold my sister . . . ." Arango testified that following the transaction, she returned to the Drug Task Force office, where the wire that had been previously placed in her car was removed. Arango stated that she had never bought drugs from the Defendant before September 29, and she denied that she coerced the Defendant in any way to make the sale on September 29.

Following Arango's testimony, several witnesses testified on the Defendant's behalf. Mike Prince, the Defendant's friend and former supervisor at McDonald's, testified that the Defendant had no propensity to use or sell illegal drugs. He stated that he believed that the Defendant's recorded conversations with Arango appeared to be merely "fun conversations" and explained that the Defendant "likes to carry on a little bit."

Cordell McKissack, a police officer with the Spring Hill Police Department, testified that he and the Defendant formerly worked as partners on the same shift. He testified that he saw no inclination for the Defendant to use or sell illegal drugs during the time that they worked together. He stated that when he and the Defendant "were messing around," the Defendant spoke in a similar manner to the way he had spoken in his recorded conversations with Arango, and he stated that the Defendant had a good knowledge from his experience as a police officer of how drug dealers talk and how drug transactions occur. However, he also admitted that at least portions of the transcripts of the Defendant's recorded conversations did not appear to be jokes. Finally, McKissack testified that he was aware that a fellow police officer had engaged in an extramarital affair with the Defendant's wife and that the Defendant and his wife had obtained a divorce.

Kimberly Duckett testified that she was employed as a billing specialist by Family Health Group. She stated that she had known the Defendant for three to four years and reported that she was the Defendant's platonic roommate from 1998 until 1999, at the time of his arrest in this case. Duckett testified that she never observed any inclination on the Defendant's part to use or sell illegal drugs, and she stated that she was shocked by his arrest. She also testified that the Defendant "bullcrapped a lot, especially if he was trying to pick up a girl."

Richard Farris, an employee of First Farmers and Merchants Bank, testified that he had known the Defendant since elementary school. He stated that to his knowledge, during the period surrounding the Defendant's arrest, "[t]here was nothing . . . to indicate . . . that he was using or selling drugs." Farris testified that he was shocked by the Defendant's arrest.

Jerry Kennedy, an automobile dealer, testified that he had known the Defendant since the Defendant's birth and stated that he was friends with both of the Defendant's parents. He stated that nothing that he knew about the Defendant would lead him to suspect that the Defendant was using or selling illegal drugs. He also testified that he was shocked by the Defendant's arrest. Kennedy stated that the Defendant "can bull pretty good."

Tommy Logue, the Defendant's cousin, testified that he had known the Defendant his whole life. He stated that he could not "think of a time that [he] would have suspected that" the Defendant was using or selling drugs. When questioned about the content of the Defendant's recorded

conversations with Arango, Logue stated, "[The Defendant] just recently I guess, got a divorce and . . . talking with a female, you might talk any kind of crap to, you know, move along."

Becky Logue, the Defendant's sister, testified that she was an employee of Saturn. She maintained that not only did she not suspect her brother of using or selling drugs, but she also knew "how against [drugs] he's been." She stated that she had never used cocaine, that no one had recently sold her cocaine, and that she did not know of anyone in the drug business. She reported that she was the Defendant's only natural sister and that although the Defendant also had step-sisters, none of them lived in Maury County. She stated that she was shocked by the Defendant's arrest and thought it must have been a mistake. When questioned about the transcripts of the Defendant's conversations with Arango, the Defendant's sister stated, "It sounds like him goofing off is what it sounds like." She also testified that during the conversations, the Defendant appeared to be "[p]laying a bigshot, trying to impress somebody."

Christie Masterson testified that she was the Defendant's girlfriend and that she had been dating the Defendant "off and on" for almost two years at the time of trial. She stated that she never observed any behavior on the Defendant's part that would have led her to suspect that he was using or selling drugs. Masterson testified that at the time of the transaction, the Defendant "was going through a lot of problems . . . because of the divorce and the affair that his wife and former partner had had," and she stated that the Defendant was under a great deal of stress.

The Defendant testified that he was thirty-five years old and that he was born in Maury County. He stated that he had served in the United States Air Force for nine years and three months, that he had been honorably discharged from service, and that he was a sergeant when discharged. He testified that after serving in the United States Air Force, he returned to Columbia with his wife and began working as a police officer for the Spring Hill Police Department. He stated that he worked as a patrolman from 1995 until 1999, when he resigned from the police department. He stated that he resigned because his wife became romantically involved with another police officer with whom he worked and became pregnant. He testified that he filed a complaint with his department, "received no concern at all from the department," and decided he no longer wished to be part of the department.

The Defendant testified that he and his wife divorced in 1999. He reported that after his divorce, he "[b]asically fell apart." The Defendant testified that he and his wife had a five-year-old son, of which they maintained joint custody. He also testified that his wife gave birth to a child by his former co-worker shortly after their divorce. He indicated that he believed that members of the Drug Task Force knew the police officer with whom his wife had had an affair and may have initiated the undercover drug transaction to prevent him from obtaining custody of his son.

The Defendant reported that after leaving the police force, he worked for a short time selling cars, and he also worked part-time as a security officer for McDonald's. The Defendant testified that he first met Jennifer Arango while he was selling cars because she bought a car from one of his co-workers. He stated that he remembered her because she was "an attractive young lady." He recalled

that approximately a month later, Arango drove through the McDonald's parking lot, where he worked, and they spoke briefly. The Defendant stated that Arango and others often "cruise[d] through" the parking lot. He testified that Arango told him that she was twenty-three years old and that she had a young daughter. He stated that he and Arango discussed their children and the Defendant's relationship with his wife.

The Defendant admitted that he had tried marijuana once in high school, but he denied ever using drugs afterwards. He reported that he did drink alcohol. He stated that he was aware that Arango smoked cigarettes and drank alcohol. He said that he sometimes saw Arango at a local nightclub and that she had invited him to meet her there on occasion after his divorce. The Defendant testified that on one occasion when he saw Arango at the club, she asked him if he smoked marijuana, and he told her that he "didn't really care for it." He stated that she told him that she smoked marijuana. He also testified that Arango had asked him a few times if he knew where she could get marijuana, but he maintained that he told her, "I don't know where you could get any. I'm not familiar with anybody that's got any around here."

The Defendant testified that after meeting Arango at the nightclub one evening, they left the club together at approximately 1:30 a.m. and went to his house. He claimed that while at his house, they engaged in consensual sexual intercourse and then went back to the club. He stated that Arango appeared to have been "drinking quite a bit." The Defendant claimed that a few days later, he and Arango again had sexual intercourse. He stated that he encountered Arango while he was "driving around," and they drove to some property owned by his former wife's parents, where they again had consensual intercourse. The Defendant testified that he believed Arango began to ask him for drugs at some point before they had intercourse a second time.

The Defendant stated that after driving with Arango to the property owned by his former wife's parents, he next saw Arango at McDonald's. He said she told him that her friend needed some "s-h-i-t," meaning marijuana, because her friend had "a man . . . that she had taken some drugs from and . . . he had found out about it and he was real dangerous and she was scared of him . . . ." The Defendant reported that Arango told him "she needed it really bad and she didn't want anything to happen to her friend." He also claimed that she told him, "If you don't get me something, I'll go to the police and say you raped me those nights that we had sex." He testified that at the time, his child custody suit was pending. The Defendant testified that he did not contact the police about Arango's threats because he was afraid he would lose custody of his child and because he "didn't trust the police at the time." He admitted that Arango did not make any such threat during their recorded conversations.

The Defendant testified that in response to Arango's threats, he initially stalled, not knowing what to do. He stated that Arango showed up at McDonald's three times on September 24, 1999 looking for drugs, and he told her that she "just missed the dealer," who had left because Arango was late. He stated that on September 29, 1999, he went to Alabama for a weekend trip. He reported that when he returned, he found four calls from Arango on his "[c]aller ID." He claimed that he did not recognize the number and stated that he therefore called the number. Arango answered and asked

him if he had "gotten her anything." He testified that he told her he had not, and he stated that Arango again pressured him to obtain drugs for her.

The Defendant stated that he eventually obtained a small amount of cocaine from his neighbor, but insisted that he did not pay for the cocaine. He explained that his neighbor had gotten it for no cost, and she let him have it free of cost. Although the Defendant admitted that he gave the cocaine to Arango, he maintained that he did not charge Arango for the cocaine. He admitted that he knew it was a crime to possess or sell cocaine. However, he stated, "I just felt like I didn't have a choice." The Defendant testified that after the transaction, he did not hear from Arango again.

When asked about the language he used during his recorded conversations with Arango, the Defendant testified that he had learned to talk like a drug dealer when he worked as a police officer. When asked about his recorded threat to kill Arango, he stated, "I just kid around like that. It was like a metaphor, it just flowed. I couldn't have even told you I said it." When asked about his reference to his "sister" during the conversations, the Defendant testified, "I just used the word 'sister' because . . . of just trying to convince her it was okay. I just used 'sister' I guess as a metaphor, whatever, a fake name." He stated that none of his sisters used drugs. The Defendant further explained that his statement that the source of the cocaine was "close" to one of his family members was untrue, stating, "I didn't want [Arango] to think that I was . . . going to leave there and go straight to the police . . . ." He also explained that he told Arango that he could "hook [her] up with . . . a [. . .] bigger wad" because he thought Arango and his source would "eventually . . . work together . . . , and [Arango would] leave [him] alone." He stated that he had learned from his neighbor how to lace a marijuana cigarette with cocaine.

The Defendant maintained that at the time of the transaction in this case, he was neither using nor selling drugs. He stated that on the day following his arrest, he went to Baptist Centre Care and took a drug test to show that he was not using drugs. He stated that he had applied for a job as a police officer in Columbia and that at the time of his arrest, his application was pending. The Defendant testified, however, that immediately after his arrest, the police department removed his name from the hiring list. He stated that he knew that he would be required to submit to a drug test as part of his application process and therefore could not take drugs.

Finally, the Defendant testified that after he was arrested, he was interrogated at the Drug Task Force office. He admitted that he did not answer some of the questions he was asked truthfully. He stated that he told the officers that he "didn't remember anything" and that he "may have been drinking." He explained that he did so because he did not have an attorney and he "felt like [the officers] were trying to drag something out of [him] prior to [his] getting any legal advice." He stated that he was unaware that his interview was recorded. In addition, the Defendant admitted that he lied in court in a prior hearing by telling the court that he had obtained the cocaine from an area known as East Hill. He explained that he lied because he "was scared what would happen to [him and his son] if [he] revealed the name" of his actual source. The Defendant testified that he was aware that perjury is a crime.

## I. EVIDENCE CONCERNING THE SOURCE OF THE COCAINE

### A. Admissibility of the Evidence

The Defendant first argues that the trial court erred by refusing to allow evidence concerning the source of the cocaine which he transferred to Jennifer Arango. During redirect examination, the Defendant testified that he possessed photographs taken during the morning hours on New Year's Eve 2000 of his neighbor and the source of her drugs leaving his neighbor's house. He testified that the photographs depicted the source's car and license plate. He testified that the photographs also depicted his neighbor looking both ways as the source left her house.

In a jury-out hearing following this testimony, the defense stated that the Drug Task Force maintained a file regarding the source of cocaine, who was "one of the larger drug dealers, cocaine dealers in Columbia," and the State confirmed that the file existed. The defense attempted to introduce the photographs and the file into evidence. It also stated that it wished to subpoena an agent from the Drug Task Force to testify concerning the file. The State argued that the evidence should not be introduced because the photographs did not confirm that a drug transaction actually occurred on the date that the photographs were taken, stating, "[T]he pictures do nothing more than to show that [the source has] gone in and out of [the neighbor's] house." The Defendant admitted during the jury-out hearing that he never actually saw the source provide his neighbor with cocaine, but he stated, "I was on the phone with her when she said he brought me some stuff."

The defense argued that it wished to introduce the photographs because the State had attacked the Defendant's credibility, emphasizing that the Defendant had presented three different versions of where he had obtained the cocaine in this case. The Defendant testified that he first told officers he did not know where he had gotten the cocaine and that he then told the court that he had obtained it from someone in the East Hill area. However, at his trial, the Defendant maintained that he obtained the cocaine from his neighbor, who in turn had obtained it from the drug dealer depicted in the photographs. The Defendant thus sought to introduce the photographs to corroborate his testimony at trial concerning the source of the drugs. The court ruled against the Defendant, stating, "We're going too far afield in this case." The defense then requested that a copy of the Drug Task Force file concerning the alleged source of the cocaine be filed under seal.

The Tennessee Rules of Evidence state that all relevant evidence is generally admissible. Tenn. R. Evid. 402. Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, "although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. As a general matter, the admissibility of the evidence rests within the discretion of the trial court. State v. Sheline, 955 S.W.2d 42, 46 (Tenn. 1997).

We conclude that the trial court did not abuse its discretion by refusing to admit evidence concerning the initial source of the cocaine that the Defendant later provided to Arango. The Defendant was convicted of the casual exchange of a controlled substance. The source of the controlled substance is irrelevant as to the Defendant's guilt. Furthermore, the relevance of the evidence with regard to the Defendant's credibility is, at best, questionable. The photographs and Drug Task Force file, viewed in a light most favorable to the Defendant, merely show that a known drug dealer was seen walking in and out of the Defendant's neighbor's home. No direct evidence was offered to show that the dealer ever sold cocaine to the Defendant's neighbor or that the neighbor later provided the Defendant with the cocaine. The evidence was simply not probative of any determinative issue in this case. Assuming, however, that this circumstantial evidence was relevant and probative, we conclude that "its probative value was substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

## B. Offer of Proof

The Defendant further argues that the trial court erred by denying him the opportunity to make an offer of proof concerning this issue. Specifically, he argues that he should have been allowed to subpoena an agent from the Drug Task Force to testify concerning the file maintained by the Drug Task Force on the alleged source of the cocaine. He also contends that the trial court should have allowed him to place the file under seal in the record for appellate review. The State counters that the Defendant was indeed allowed to make an offer of proof concerning this issue.

The record reveals that the trial court did allow the Defendant to make an offer of proof concerning this issue. As we have previously stated, following the Defendant's testimony on redirect examination that he possessed photographs of the source of the cocaine leaving his neighbor's home, the trial court held a hearing outside of the presence of the jury to determine the admissibility of evidence concerning this issue. During the jury-out hearing, the Defendant was allowed to testify on the record about his knowledge of the source's involvement as a drug supplier with his neighbor, and he admitted that he had not seen the source actually transfer any cocaine to his neighbor. The contested photographs were also marked for identification only during the hearing and are thus included in the record on appeal. However, the Defendant was not allowed to make an offer of proof concerning the Drug Task Force file on the alleged source of the cocaine, and he was not allowed to call a Drug Task Force agent to testify regarding the file. Although the State admitted that the file existed, neither party was privy to the actual contents of the file. The trial court ruled that to allow the defense to explore this evidence would be "going too far afield" from relevant matters.

"[C]ourts are required, in appropriate circumstances, to allow offers of proof when evidence is excluded so as to enable consideration of the issue on appeal." Alley v. State, 882 S.W.2d 810, 815-16 (Tenn. Crim. App. 1994); see also State v. Goad, 707 S.W.2d 846, 852 (Tenn. 1986) (stating that "[i]n order for an appellate court to review a record of excluded evidence, it is fundamental that such evidence be placed in the record in some manner"). A second purpose for an offer of proof is to "inform[] the trial court what the party intends to prove so that the court may rule intelligently."

Alley, 882 S.W.2d at 815. Appellants who challenge rulings excluding evidence must make an offer of proof "unless the substance of the evidence is otherwise apparent." Id. at 815.

An appellate court may find that a trial court erred in excluding evidence only if a party's substantial rights were affected and an offer of proof is contained in the record. Tenn. R. Evid. 103(a)(2). This court has stated that "[i]n circumstances in which it is obvious from the record that the proffered evidence could, under no circumstances, be relevant to the issues, a trial court's refusal to grant an offer of proof is not error." Alley, 882 S.W.2d at 816. "However, if the obvious incompetence or irrelevance is not readily apparent from the record, it is error to exclude any reasonable offer which demonstrates the relevance and general import of the excluded evidence." Id.

We conclude that the trial court did not err by refusing to allow the Defendant to place a copy of the file maintained by the Drug Task Force on the alleged source of the cocaine under seal for appellate purposes and by refusing to allow the Defendant to subpoena a Drug Task Force agent to testify concerning the contents of the file. As we have previously stated, the contents of the file are irrelevant as to the Defendant's guilt or innocence. Furthermore, as we have noted, the relevance of this evidence with regard to the Defendant's credibility is, at best, questionable. Even if the file had demonstrated that the alleged source was a convicted drug dealer and even if the file had established a strong link between the alleged source and the Defendant's neighbor, it would not have substantiated the Defendant's claim that he obtained the cocaine in this case from his neighbor. The file was not a file concerning the Defendant's neighbor, but rather a person with whom she was allegedly acquainted.

Finally, we conclude that even assuming that the trial court did err by refusing to allow evidence concerning the source of the cocaine which the Defendant transferred to Jennifer Arango or by refusing to allow an offer of proof regarding the Drug Task Force file, any such error was harmless. See Tenn. R. App. P. 36(a); Tenn. R. Crim. P. 52(a). The Defendant admitted to facts constituting a casual exchange of a controlled substance, see Tenn. Code Ann. § 39-17-418 (stating that "[i]t is an offense for a person to knowingly possess or casually exchange a controlled substance"), and the jury convicted him of the casual exchange of a controlled substance. We are unconvinced that admission of the contested evidence would have affected the result of the trial on the merits, see Tenn. R. Crim. P. 52(a), or that the Defendant's substantial rights were affected by the trial court's refusal to allow a further offer of proof concerning the Drug Task Force file. See Tenn. R. Evid. 103(a).

## II. SENTENCING

The Defendant next argues the trial court erred by failing to grant him full probation. As previously stated, the trial court sentenced the Defendant to eleven months, twenty-nine days' incarceration and suspended all but forty-five days of the sentence. The crime of which the

Defendant was convicted in this case is a Class A misdemeanor. See Tenn. Code Ann. § 39-17-418(c). An appropriate sentence for a Class A misdemeanor is "not greater than eleven . . . months[,] twenty-nine . . . days . . . , unless otherwise provided by statute." Id. § 40-35-111(e)(1).

When a criminal defendant challenges the length, range, or manner of service of a sentence, the reviewing court must conduct a de novo review of the sentence with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). A trial court need only consider the principles of sentencing and the enhancement and mitigating factors in order to comply with the legislative mandates of the misdemeanor sentencing statute. Id. If our review reflects that the trial court followed the statutory sentencing procedure, that the court imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and that the trial court's findings of fact are adequately supported by the record, then we may not modify the sentence "even if we would have preferred a different result." State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). The defendant bears the burden of showing the impropriety of the sentence imposed. State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

Misdemeanor sentencing is controlled by Tennessee Code Annotated § 40-35-302, which provides in part that the trial court shall impose a specific sentence consistent with the purposes and principles of the 1989 Criminal Sentencing Reform Act. Tenn. Code Ann. § 40-35-302(b); State v. Palmer, 902 S.W.2d 391, 394 (Tenn. 1995). Misdemeanor sentencing is designed to provide the trial court with continuing jurisdiction and a great deal of flexibility. State v. Baker, 966 S.W.2d 429, 434 (Tenn. Crim. App. 1997). The misdemeanant, unlike the felon, is not entitled to the presumption of a minimum sentence. State v. Creasy, 885 S.W.2d 829, 832 (Tenn. Crim. App. 1994). In determining the percentage of the sentence to be served in actual confinement, the court must consider enhancement and mitigating factors, and a percentage of not greater than seventy-five percent of the sentence should be fixed for service, after which the defendant becomes eligible for "work release, furlough, trusty status and related rehabilitative programs." Tenn. Code Ann. § 40-35-302(d). The court should not impose such percentages arbitrarily. Id. In misdemeanor sentencing, a separate sentencing hearing is not mandatory, but the trial court is required to allow the parties a reasonable opportunity to be heard on the question of the manner in which it is to be served. Id. § 40-35-302(a). The Tennessee Supreme Court has held that in misdemeanor sentencing, a trial court is not required to place specific findings on the record. State v. Troutman, 979 S.W.2d 271, 274 (Tenn. 1998).

The Defendant more specifically argues that he should have been granted full probation. The decision to grant or deny probation lies within the discretion of the trial court. See Stiller v. State, 156 S.W.2d 617, 620 (Tenn. 1974). In determining whether to grant or deny probation, the trial court may consider the circumstances of the offense; the defendant's criminal record, background and social history; the defendant's physical and mental health; the deterrent effect on other criminal activity; and the likelihood that probation is in the best interests of both the public and the defendant. State v. Parker, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996). The defendant bears the burden of establishing suitability for probation. Tenn. Code Ann. § 40-35-303(b); Ashby, 823 S.W.2d at 169.

A transcript of the sentencing hearing is not included in the record. However, pursuant to Rule 24(c) of the Tennessee Rules of Appellate Procedure, the Defendant filed a statement of the evidence presented at the sentencing hearing. According to the statement, the trial court applied mitigating factor (13), the catchall factor, but the trial court's reasons for applying this factor are unclear from the record. See Tenn. Code Ann. § 40-35-113(13). The court also applied enhancement factor (15), which provides in part that the "defendant abused a position of public or private trust . . . ." Id. § 40-35-114(15). It appears that the court applied enhancement factor (15) because, according to the statement of evidence, the court noted that the Defendant was "an ex-police officer who broke the law." According to the statement of the evidence, the trial court also based its denial of probation on the Defendant's "attitude, his lack of remorse, and his failure to accept responsibility for his actions." The court is quoted in the statement of evidence as follows: "If the Court had heard one smidgen of remorse or one smidgen of acceptance of responsibility from Mr. Logue, he would walk out of the courtroom on full probation."

Having reviewed the record, we conclude that the trial court erred by applying enhancement factor (15) in this case. See Tenn. Code Ann. 40-35-114(15). The application of this factor requires, first, a finding that the defendant occupied a position of either public or private trust and, second, a finding that the defendant "abused" that position. Id.; see State v. George Dennis Fields, No. 01C01-9801-CR-00031999, 1999 Tenn. Crim. App. LEXIS 444, at *15 (Tenn. Crim. App., Nashville, May 6, 1999). Although this Court has noted that a police officer occupies a position of public trust, see George Dennis Fields, 1999 Tenn. Crim. App. LEXIS 444, at **14-15; State v. Dockery, 917 S.W.2d 258, 262-63 (Tenn. Crim. App. 1995), overruled on other grounds by Troutman, 979 S.W.2d at 274 n.3, the record reveals that the Defendant was not a police officer at the time of the crime in this case.

However the record justifies the denial of probation on other grounds. "A defendant's lack of candor, credibility, and willingness to accept responsibility for his crime are relevant considerations in determining a defendant's potential for rehabilitation, and its lack thereof is a proper consideration in determining whether probation or confinement is appropriate." State v. Carlos Bierner, No. E2001-01857-CCA-R3-CD, 2002 Tenn. Crim. App. LEXIS, at *18 (Tenn. Crim. App., Knoxville, Sept. 13, 2002) (citing State v. Zeolia, 928 S.W.2d 457, 463 (Tenn. Crim. App. 1996); State v. Dowdy, 894 S.W.2d 301, 306 (Tenn. Crim. App. 1994); State v. Anderson, 857 S.W.2d 571, 574 (Tenn. Crim. App. 1992); State v. Bryant, 775 S.W.2d 1, 6 (Tenn. Crim. App. 1988)). Here, the trial court found that the Defendant was untruthful and unwilling to accept responsibility for his actions, and the record supports these findings by the trial court. In fact, the Defendant admitted at trial that he had lied during a previous court proceeding. Furthermore, we note that the trial court apparently gave these findings great weight because it stated that if the Defendant had shown "one smidgen of remorse or one smidgen of acceptance of responsibility," the court would have granted him full probation. We therefore conclude that the trial court did not abuse its discretion by denying full probation in this case.

Accordingly, we AFFIRM the judgment of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE